RIDDLE v. GRAYSON et al.

No. 28925.   Jan. 9, 1940.

Rehearing Denied Feb. 20, 1940.

Application for Leave to File Second Petition for Rehearing Denied Sept. 17, 1940.

*105 P. 2d 248.*

---

Martin J. Ward, D. F. Rainey, and F. E. Riddle, all of Tulsa, for plaintiff in error.

Albert C. Hunt, of Oklahoma City, H. B. Parris, of Eufaula, S. E. Gidney, of Muskogee, A. A. Hatch, of Tulsa, Clyde J. Watts, of Oklahoma City, Watts & Watts, of Wagoner, and J. T. Smith, of Tulsa, for defendants in error.

RILEY, J. This is an appeal from a judgment against F. E. Riddle and in favor of defendants in error. F. E. Riddle intervened in an action or proceeding which originated in about 1917. The original action was one by defendants in error against James A., and William Harris, and others claiming under or with them.

It appears that some time prior to August, 1917, James A. Harris and William H. Harris had purchased and taken deeds from certain persons supposed to own an undivided one-half interest in certain lands in Creek county, being the lands originally allotted to Garfield Colbert and Nancy Colbert. James Brann owned the other undivided one-half interest in said land.

James A. Harris and William H. Harris, claiming as owners of an undivided one-half interest in said lands, some years before 1917, had gone upon and developed said lands or a part thereof for oil and gas.

On August 4, 1917, Isom Grayson and others commenced an action in the district court of Creek county to recover an interest in the undivided one-half interest in the land claimed by the Harrises, for partition as between them and the Harrises; an accounting for the oil and gas taken from said land and for the appointment of a receiver to take charge of said lands so as to conserve the oil and gas.

On February 21, 1920, the court rendered judgment decreeing plaintiffs in said action to be the owners of a 9/22 interest in said land, and the Harrises the owners of 2/22 and James Brann to be the owner of the remaining 11/22 or ½ interest. The interest of Brann was not disputed. The judgment also decreed plaintiffs were entitled to an accounting for the oil and gas taken. Whether a receiver was appointed before the decree is not disclosed by the record before us. But after judgment was entered a receiver was appointed to take charge of the 9/22 interest in the land decreed to plaintiffs and the 9/22 of the oil and gas produced therefrom or its proceeds and hold the same pending final disposition of the case. No receiver was appointed to take charge of or collect for the oil and gas produced from the 2/22 interest decreed to the Harrises. The plaintiffs did not appeal from said judgment. James A. and Wm. H. Harris did appeal.

The judgment was reversed and plaintiffs appealed to the Supreme Court of the United States. A number of decisions were rendered. In 1930, the cause was remanded to the district court of Creek county for new trial. January 23, 1932, judgment was again entered in the district court of Creek county, the same as the original judgment except as to 40 acres of land. As to that 40 acres it was decreed that the Harrises were the owners of 2/22 interest acquired by their original deed, and, in addition thereto, the other 9/22 interest except as to certain plaintiffs,

who were minors at the institution of the action. Again it was decreed that plaintiffs were entitled to an accounting, but accounting was reserved until final determination of the case in the event of an appeal. The Harrises again appealed to this court, where the judgment was affirmed in 1932, and the cause was remanded for an accounting. Harris v. Grayson, 173 Okla. 163, 47 P. 2d 879.

The Texas Company was the purchaser of the oil, and after the appointment of the receiver the proceeds from 9/22 of the oil was paid to the receiver. The proceeds from 2/22 of the oil, that part represented by the 2/22 interest in the land decreed to the Harrises, were paid to a bank to which the Harrises had assigned the proceeds, until about 1927, at which time one of the attorneys wrote the Texas Company that plaintiffs were claiming or would claim a lien on the additional 2/22 represented by the Harrises' interest. Thereupon the Texas Company ceased paying the bank. As a result $3,400, representing the 2/22 interest of the Harrises in the land, accumulated in the hands of the Texas Company.

Some time in 1933, the attorney who had represented the Harrises in the litigation died, and thereafter the Harrises employed F. E. Riddle, plaintiff in error herein, to represent them in said litigation. At the same time they orally assigned all their interest in the fund thus accumulated and to accumulate to Riddle in payment of and as security for his services. January 28, 1935, this assignment was reduced to writing reciting and confirming the former oral assignment. This assignment was made subject to the prior assignment in favor of the Producers Bank, as to any amount remaining unpaid on the indebtedness of the Harrises to said bank, then estimated to be about $1,000. It was later decreed that there was no balance due on said indebtedness, so that Riddle thereby became the owner of whatever interest the Harrises may have had in said accumulated fund.

June 10, 1937, in the accounting proceeding, judgment was rendered in favor of the plaintiffs in that action, defendants in error here, and against James A. Harris and William H. Harris. This judgment provided that it was without prejudice to the rights of Riddle. Thereafter Riddle filed a plea in intervention setting up his claim to the fund in question. So far as this record discloses, the Texas Company was not made a party to the litigation. The Harrises had become insolvent. James A. Harris, Jr., filed a like plea claiming to be the owner of a balance due on the alleged mortgage indebtedness of the Harrises to the Producers Bank. Issues were joined in these pleas. Defendants in error asserted, in substance, that in the original petition filed in 1917, they claimed to be the owners of an undivided one-half interest in the lands involved; that the Harrises claimed all the interest to the exclusion of plaintiffs therein, and that the Harrises were taking and converting to their own use the oil and gas from said land, and that they should be held to account for the same, and that any judgment in their favor in such accounting be made a lien against the respective interests of said defendants.

The trial court denied the claim of Riddle and entered a judgment in effect reaffirming the right of plaintiffs to partition and declaring an equitable lien on all the interests of the Harrises in the land itself, and also on the funds in the hands of the Texas Company.

Plaintiff in error cites a number of cases holding in effect that a claim against a cotenant for unequal use and occupation of the common property is a simple debt and creates no lien on the land.

Defendants in error cite a number of cases holding to the contrary. But the right to a lien on that interest of the land itself owned by the Harrises is not questioned in this case. Riddle is claiming no interest in the land itself, and the Harrises are not appealing from the decree in this case.

Cases are also cited holding that on partition where shares unequal in value are assigned to tenants in common owning equal interests in the common property, the one to whom is assigned the share of less value may have a money judgment termed "owelty" against the one to whom the share of the greater value is assigned to equalize the difference in value, and this judgment may be declared a lien on the part of the land allotted to the party against whom such judgment is rendered. But that is not this case. That question is not involved.

The question is whether a lien may be declared against the fund in question assigned to plaintiff in error.

It may be observed that the funds in question were never brought into the "custody of the court." No receiver was ever appointed to take charge of and preserve the fund. The Texas Company was never made a party, and no order of the court was ever made directing the control or disposition of this fund until the decree here involved. Until that order was made, the Texas Company was free, so far as any order of the court was concerned, to pay said money to the Harrises or to their assignee.

The Texas Company did pay the proceeds from the 2/11 of the one-half of all the oil produced from said lands to the assignee of the Harrises for more than five years from the appointment of the receiver, without protest from anyone.

We have examined the order appointing a receiver made in May, 1920, and it shows that the receiver was appointed for and ordered to take charge of only the "undivided 9/22 interest" in certain particularly described tracts of land involved in the litigation. Prior thereto, to wit, February 21, 1920, the court had entered its decree declaring that "James A. Harris and William H. Harris are the owners in fee each of an undivided 1/22 of all the land in controversy." From that part of the decree none of the plaintiffs appealed. That

same interest, together with an additional interest in one 40-acre tract of the land, was decreed to the Harrises in the decree of November 2, 1931, which was finally affirmed by this court in Harris v. Grayson, 173 Okla. 163, 47 P. 2d 879.

By the original decree James Brann was decreed to be the owner of an undivided one-half interest in all the land, and plaintiffs were decreed to be the owners of the remaining 9/22 interest. James Brann was appointed receiver for that 9/22 interest with orders and directions to take charge of and continue to operate the property for oil and gas, and "sell the oil produced to the pipe line company now receiving said oil. * * *" The receiver was also empowered to drill other wells, etc., pay all costs of operation, etc., from the proceeds of oil sold, and "pay all bills incurred by him chargeable against the said 9/22 interest out of the proceeds of oil sold. * * *"

The receiver was thereby authorized to produce and sell all the oil, but account to plaintiffs for only 9/22 thereof. 11/22 of the proceeds belonged to Brann individually. This left 2/22 of the oil which the receiver was authorized to produce and sell to the pipe line company, but was not required to collect and hold the proceeds as receiver. Did the pipe line company acquire title thereto? No contention is made that this amounted to a conversion of the 2/22 of the oil produced from the land in controversy. No contention is made that the pipe line company did not acquire title to the oil. After the decree of February 21, 1920, was entered and became final as to this 2/22 interest in the land, the pipe line company segregated or set up on its books a separate account representing this 2/22 of the oil purchased.

The question then arises as to whom payment therefor should be made. No claim in court was being made therefor, neither by the receiver nor by the plaintiffs. The Harrises made an assignment thereof to the Producers Bank,

and for more than five years thereafter the pipe line company paid the assignee without question from anyone.

Defendants in error, in effect, assert that after oil is discovered in or under a tract of land the oil is then a part of the real estate, and the taking thereof amounts to a reduction of the corpus of the estate, and that under the circumstances in this case, the taking of the 2/22 of the oil by the Harrises or their assignees was conversion of a part of the corpus of the land itself which should have been held to await the final accounting and applied to the payment of defendants in error for their part of the oil taken before the litigation was commenced.

In this connection they cite Breeding v. Ritterhoff, 126 Okla. 225, 259 P. 227; Aldridge v. Houston Oil Co., 116 Okla. 281, 244 P. 782, and Gade v. Loffler, 171 Okla. 313, 42 P. 2d 815.

In Breeding v. Ritterhoff, supra, it is held:

"When, under an oil and gas lease, production is reached, the income ceases to be rents and profits and the fee is impaired and diminished to the extent of the value of the oil and gas which is reduced to possession. Such conversion of the fee pro tanto constitutes waste."

It was there held in effect that a mortgage given prior to the execution of an oil and gas lease took precedence over such oil and gas lease, and that upon foreclosure of the mortgage, the property should be sold free and clear of such oil and gas lease.

Aldridge v. Houston Oil Co. et al., supra, does not involve the question of the right to the proceeds from oil. The only question there involved was whether rentals and delay money paid under an oil and gas lease constituted income and rents from the land, so as to entitle the owner of a dower interest in the land to share therein.

Defendants in error assert that Gade v. Loffler, supra, is "absolutely decisive and controlling" in the case at bar.

It is in some respects similar, but in others it is entirely different. There it appears that oil and gas royalty from certain lands had been divided into 1,000 units. Certain of these units were known as the "Kisner units." G. D. Loffler was the owner of said units and pledged 41 of them as security for a loan made to him by August Gade. After said pledge and before recording of the instrument pledging said 41 units, G. D. Loffler conveyed the same units, and apparently others, to third persons. The action was by Gade to set aside said conveyances and subject the units to the payment of the loan. While the litigation was pending the proceeds representing these 41 units of the royalty were impounded. It was held that the proceeds so impounded were applicable to the payment of the loan after judgment was obtained setting aside the conveyance to the third parties named. But in that case proceeds from other units were not involved. In fact some of the proceeds representing royalty other than that represented by 41 units was impounded, but were later released by agreement of the parties, so that case differs from the one at bar in that there only proceeds from the part of the royalty actually pledged were involved. All the proceeds actually applied to the judgment were proceeds coming from that part of the royalty represented by the particular 41 units. In other words, the fund there in controversy would correspond to the funds in this case represented by the 9/22 interest in the land owned and decreed to defendants in error herein. That part of the proceeds of royalty impounded and later released by agreement, would substantially correspond to the fund in question in the instant case. Therefore the Gage Case is neither decisive nor controlling in the instant case.

A number of cases from other jurisdictions involving cutting and removing timber from land are cited. But in none of them were the facts similar to the facts in this case. Not one of them holds that part of proceeds of timber cut and removed from land represent-

ing a proportionate interest in the land actually owned by the party charged could be followed into the hands of third parties and made to apply to a debt or claim for excess taking by the party who owned an interest in the land.

We again call attention to the fact that at no time did the court issue any order impounding the particular funds here in question. At no time after the decree of February 21, 1920, did the plaintiffs apply to the court for such an order. The plaintiffs did apply for and receive an order for the receiver to collect from the Texas Company part of the proceeds representing the 9/22 of the oil produced and sold prior to the appointment of the receiver. The 2/22 represented by the interest of the Harrises was apparently excluded. It therefore appears that at no time after the judgment and decree of February 1, 1920, did the plaintiffs nor any of them apply to the court for an order to the receiver to take charge of the 2/22 interest of the Harrises in the land or to collect and impound the proceeds from the oil as to said 2/22 interest.

The original order appointing a receiver shows that it was made on the application of plaintiffs and called for a receiver only for the 9/22 interest. Again in the proceeding going to the approval and settlement of the account of the receiver about January, 1932, Mr. Hatch, representing all the defendants in error herein, stated in open court: "* * * and so nine-elevenths of one-half is all that is in controversy; and this money is money derived from the nine-elevenths of this land."

Throughout that controversy, which was hotly contested and found its way to this court by a separate appeal, Brann v. Harris, 173 Okla. 167, 47 P. 2d 876, it was apparently conceded that the Harrises were entitled to collect for 2/22 of the oil. Particularly is this the case with reference to approximately $9,000 worth of casinghead gas produced from the land during the receivership proceedings up to that time. It is clear that 2/22 of that amount so accrued was treated as belonging to the Harrises.

As to the fund in question here, the situation is similar to that in Gilman et al. v. Illinois & Mississippi Telegraph Co., 91 U. S. 603, 23 L. Ed. 405. There a mortgage was executed by a railroad company to certain trustees covering its road, property and franchises, together with the tolls, rents, and profits to be had, gained, or levied therefrom.

A second mortgage covering the same property, together with the rents, tolls, etc., derived or to be derived therefrom was executed to other trustees, with the provision that in case of default of the payment of interest when due the trustees might take possession of all the property. Default was made, but the trustees never took possession. The trustees in the second mortgage commenced suit to foreclose making the trustees in the first mortgage and other judgment and lien creditors parties. No receiver was appointed pending foreclosure until sale of the property had been advertised by the sheriff. In the meantime the Illinois & Mississippi Telegraph Company issued an execution on a judgment which it had theretofore obtained against the railroad company and garnisheed money in the hands of the agents of the railroad company, which was then still in possession of the property. It was held that notwithstanding the mortgage covered rents, tolls, etc., the latter lien took precedence over the lien of the mortgage in so far as it covered the rents, profits, tolls, etc.

Therein it was said:

"In the present state of the law, where there is no prohibition by statute, it is competent for the mortgagee to pursue three remedies at the same time. He may sue on the note or obligation, he may bring an action of ejectment, and he may file a bill for foreclosure and sale. 1 Hill on Mort. 9, 62, 104, 111; Andrews v. Sutton, 2 Bland, 665.

"The remedy last mentioned was resorted to in the state court by the mortgagees in the second mortgage, those in

the first having been made parties, and that mortgage thus brought before the court. That court, therefore, had full jurisdiction as to the rights of all the parties touching both instruments. It would have been competent for the court, in limine, upon a proper showing, to appoint a receiver, and clothe him with the duty of taking charge of the road and receiving its earnings with such limit of time as it might see fit to prescribe. It might have done the same thing subsequently, during the progress of the suit. When the final decree was made, a receiver might have been appointed, and required to receive all the income and earnings until the sale was made and confirmed and possession delivered over to the vendee.

"Nothing of this kind was done. There was simply a decree of sale. The decree was wholly silent as to the possession and earnings in the meantime. It follows that neither, during that period, was in anywise affected by the action of the court.

"They were as if the decree were not.

"As regards the point under consideration, the decree may, therefore, be laid out of view. * * *

"Nothing was done in the exercise of the right which the mortgages gave to the mortgagees to intervene and take possession. We may, therefore, lay out of view also both these topics.

"This leaves nothing to be examined but the effect of the mortgages, irrespective of any other consideration.

"A mortgagor of real estate is not liable for rent while in possession. 2 Kent's Com. 172. He contracts to pay interest, and not rent. In Chinnery v. Black, 3 Doug. 391, the mortgagor of a ship sued for freight earned after the mortgage was given, but unpaid. Lord Mansfield said, 'Until the mortgagee takes possession, the mortgagor is owner to all the world, and is entitled to all the profit made.' "

Again, in American Bridge Co. v. Heidelbach, 94 U. S. 798, 24 L. Ed. 144, substantially the same question was before the court. Again it was said:

"In this case, upon the default which occurred, the mortgagees had the option to take personal possession of the mortgaged premises, or to file a bill, have a receiver appointed, and possession delivered to him. In either case, the income would thereafter have been theirs. Until one or the other was done, the mortgagor, as Lord Mansfield said in Chinnery v. Black, 3 Doug. 391, was 'owner to all the world, and entitled to all the profit made.' "

In this case, throughout the entire litigation, from and after the decree of February 21, 1921, it was conceded by all that the Harrises were the owners in fee of 2/22 interest in the land. At all times down to the filing of the reply to the plea of intervention of plaintiff in error, no order of court was made and no application for an order was ever made seeking to hold the proceeds of the oil produced from this 2/22 interest, although plaintiffs were at all times free to apply for such an order. Until some such order was made it would seem that the Harrises were the owners of such oil and entitled to the proceeds thereof as against all the world, and that notwithstanding the pending action for an accounting and partition, they had the right under the record made in this case to assign to plaintiff in error the money due them in the hands of the pipe line company.

The decree of the court made in 1921, and the order appointing the receiver amounted in substance to a division order authorizing the purchaser to pay to Brann 11/22 of the oil as his own; to pay him for 9/22 thereof as receiver, the net amount therein to be held to await the final outcome of the litigation, and to the Harrises for 2/22 of the oil. No subsequent order was ever made in conflict therewith until long after the assignment to Riddle.

The judgment is reversed and the cause is remanded, with directions to enter judgment in favor of intervener Riddle as herein indicated.

BAYLESS, C. J., WELCH, V. C. J., and OSBORN, CORN, HURST, and DAVISON, JJ., concur. GIBSON and DANNER, JJ., absent.